IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RODRIGO SAMUEL MEDRANO, §
§
Petitioner, §
§
VS. §                    CIVIL ACTION NO. H-07-1559
§
NATHANIEL QUARTERMAN, §
§
Respondent. §

## MEMORANDUM AND OPINION

The petitioner, Rodrigo Samuel Medrano, seeks habeas corpus relief under 28 U.S.C.

§ 2254, challenging his 2003 state felony conviction for indecency with a child.   The

respondent has moved for summary judgment, (Docket Entry No. 8), and submitted a copy

of the state court record.   Medrano filed a response.   (Docket Entry No. 12).   Based on

careful consideration of the pleadings, the motion and response, the record, and the

applicable law, this court grants the respondent's motion and, by separate order, enters final

judgment.   The reasons are set out below.

## I.    Background

A jury found Medrano guilty of the felony offense of indecency with a child.  (Cause

Number 944829).  Medrano pleaded true to enhancement paragraphs alleging two of his prior

convictions for indecency with a child (Cause Number CR-348-89-F) and indecency with a

child by exposure (Cause Number 0542100D).  *Ex parte Medrano,* Application No. 65,446-

01 at 163, 170.  On December 3, 2003, the state trial court sentenced Medrano to life

imprisonment.  The First Court of Appeals of Texas affirmed Medrano's conviction on May 19, 2005. *Medrano v. State*, No. 01-03-01270-CR, 2005 WL 1189659 (Tex. App.-- Houston [1st Dist.] 2005, pet. ref'd) (not designated for publication).  On October 19, 2005, the Texas Court of Criminal Appeals refused Medrano's petition for discretionary review.  On May 19, 2006, Medrano filed an application for state habeas corpus relief.  The Texas Court of Criminal Appeals denied the application without written order, on findings of the trial court, without a hearing, on November 22, 2006.  *Ex parte Medrano,* Application No. 65,446-01 at cover.

On May 3, 2007, this court received Medrano's federal petition.  Medrano contends that his conviction is void for the following reasons:

(1)   The trial court erred by failing to admit favorable evidence.

(2)   The evidence was legally and factually insufficient to support his conviction.

(3)   A prosecution witness testified falsely.

(4)   Trial counsel rendered ineffective assistance by

     a.   failing to investigate;

     b.   failing to call witnesses; and

     c.   failing to introduce evidence.

(5)   The conviction was obtained by evidence that should have been excluded at trial.

(6)   The Texas Court of Criminal Appeals erroneously refused his petition for discretionary review.

2

(7)     Appellate counsel rendered ineffective assistance.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 7A-7B).

## II.     The Trial Record

The prosecution called as one of its primary witnesses Deputy Mitchell Gipson with the Harris County Precinct 6 Constable's office.   Deputy Gipson testified that he was assigned to special operations and handled special events that were coordinated with the department.   (Reporter's Record, Vol. IV, pp. 3-4).   On April 6, 2003, he was providing security for a church bazaar held at the Incarnate Word Academy in downtown Houston. Deputy Gipson explained that at approximately 4:45 p.m. that day, a man asked him for help and directed him to cafeteria area.   There Deputy Gipson spoke to the event coordinator, later identified as Rosalinda Romo.   (*Id.* at 7-8).   Romo told Deputy Gipson that a young boy had been sexually assaulted in the men's restroom.   (*Id.* at 8).

Deputy Gipson testified that before he was summoned for help, he had gone to the restroom and had seen an individual standing near the entrance.   Deputy Gipson thought it odd that there was a "chaperone" for the restroom.   While Deputy Gipson was in the bathroom, a little boy entered the stall next to him. (*Id.* at 34).   Deputy Gipson could tell that it was a little boy from the size of the feet and the size of the shorts on the floor.   (*Id.* at 37). As Deputy Gipson was leaving the restroom, he heard a man call out to the little boy to get ready and saw that man go toward the stall.   Deputy Gipson thought that the man was going to help the little boy.   Deputy Gipson left the restroom and walked to the street.   Five or ten minutes later, he was then summoned to respond to the report of a sexual assault.   (*Id.* at 35).

3

In the cafeteria, Deputy Gipson spoke to the complainant, G.S., who was with a woman later identified as his aunt.  The boy gave Deputy Gipson a description of the assailant and his clothing.  While they were talking, the boy's facial expression changed.  He stepped behind his aunt, looking frightened.  From the boy's expression, Deputy Gipson concluded that he could see the assailant.  (*Id.* at 9).  The boy pointed to Medrano, who was standing by a cafeteria door about fifteen or twenty feet away.  (*Id.* at 31).  The complainant told Deputy Gipson that Medrano had assaulted him, then threatened him and told him not to tell anyone what had happened.  The complainant said that he was able to get away from Medrano and leave the restroom by promising to come back.

Deputy Gipson slowly turned around to see the person the complainant identified.  This person matched the description the complainant had given.  Deputy Gipson called for backup on his police radio.  (*Id.* at 11).  As Deputy Gipson was speaking on the radio, he saw that Medrano had a surprised expression on his face and began taking a few steps backward.  Deputy Gipson started stepping off the stage and walking toward Medrano.  At that point, Medrano stepped quickly into the kitchen and started running.  (*Id.* at 12-13).  Deputy Gipson left through the front entrance to try to catch Medrano, but was unsuccessful.  (*Id.* at 14-15).  Deputy Gipson and other officers fanned the area to search for Medrano, again without success.  (*Id.* at 16-17).  Deputy Gipson gave the following description of Medrano to his fellow officers: 5 feet 10 inches tall, 170-180 pounds, hair combed back, gold-rimmed eyeglasses, mustache and goatee, wearing a blue striped shirt, and possibly blue short pants.

Deputy Gipson returned to the Incarnate Word Academy. He was directed to two women who had accompanied Medrano to the festival. (*Id.* at 18). The women were Medrano's wife or common-law wife, Bertha, and her mother, Anita Del Angel. Medrano's wife told Deputy Gipson that her husband was moving items from a residence to storage because they were moving. She said that Medrano had been at the festival but had left. The wife also said that the address on her driver's license, 7609 Avenue E, was incorrect, and that she and Medrano were moving to 6510 Avenue K. (*Id.* at 20). Deputy Gipson testified that he did not see Medrano return to the Academy to pick up his wife and mother-in-law.

Deputy Gipson continued searching for Medrano. Deputy Gipson went to 7609 Avenue E and found that home vacant. Medrano was arrested at 6510 Avenue K at approximately 2:00 a.m. on April 7, 2003. Deputy Gipson saw Medrano after he was arrested and taken to the station. (*Id.* at 24). Deputy Gipson told his supervisor that the person under arrest was the person whom the complainant, G.S. had identified. Deputy Gipson noticed that Medrano had shaved off his facial hair and had a razor burn, which suggested a recent shave. (*Id.* at 25). Though Medrano did not have a mustache and goatee like the man Deputy Gipson had seen, and had his hair was combed differently and was wearing different clothing, Deputy Gipson was certain that Medrano was the same man he had seen at the Incarnate Word Academy. Like the man at the Academy, Medrano was wearing eyeglasses.

In the courtroom, Deputy Gipson was initially unable to identify Medrano. On redirect examination, Deputy Gipson testified that he had been unable to identify Medrano

5

during direct examination because Medrano had his head down and his face was partially hidden.  Deputy Gipson noted that Medrano was combing his hair differently, had no facial hair, and was not wearing glasses, which also made him look different than he had at the Incarnate Word Academy, but that he was the same man. .

On cross-examination, defense counsel asked Deputy Gipson the time he responded to the request for help; how much time elapsed between his conversation with the event coordinator and the complainant; what language the complainant spoke; the description the complainant provided; the time the complainant saw Medrano in the cafeteria while speaking with Deputy Gipson; the number of people in the cafeteria; whether Deputy Gipson was in the bathroom when the assault occurred; whether his identification was based on what the complainant told him; and whether he wrote down the names of the people who directed him to Delangel and her mother.

Bob Ramirez, a deputy with the Sex-Offender Division of the Harris County Precinct 6 Constable's Office, testified that on April 6, 2003, he was dispatched to 7609 Avenue E and found the home empty.  (Reporter's Record, Vol. IV, p. 61).  On his radio, he  heard Deputy Lopez, who was conducting surveillance at 6510 Avenue K, say that she saw a man meeting Medrano's description come to the house, with a woman, in a white sports utility vehicle.  The woman left and Medrano remained in the house.  Police officers knocked on the door to 6510 Avenue K.  The officers heard noises from inside the house but no one answered the door.  (*Id.* at 63, 65).

Deputy Ramirez conducted surveillance at the home at 6510 Avenue K.  At midnight, he saw Medrano and a woman get out of a white SUV and enter the home.  (*Id.* at 67). Ramirez saw a woman carry folded clothes out of the house and put them in the SUV. Deputy Ramirez had seen a photograph of Medrano.  He identified the male under surveillance as Medrano.  (*Id.* at 72).  Based on the fact that he had seen a woman carrying folded clothes to the car in the middle of the night, Ramirez feared that Medrano was planning to flee.  (*Id.* at 74).  After Medrano was arrested, Deputy Ramirez observed the live lineup.

On cross-examination of Deputy Ramirez, counsel asked whether the events he discussed took place after the offense, whether he witnessed the assault, and whether he was present at the Academy where the assault allegedly occurred.

Corporal Julio Banda with Harris County Sheriff's Department Precinct 6 testified that he was instructed to go to the Incarnate Word Academy on April 6, 2003.  (Reporter's Record, Vol. IV, p. 78).  Corporal Banda took the eight year-old complainant to a secluded area to interview him and his aunt.  Corporal Banda could tell that the complainant was frightened because his eyes were very wide and he was trembling.  (*Id.* at 82).  The complainant gave a detailed description of his assailant.  The description helped in locating Medrano.  Corporal Banda instructed a deputy to take the complainant and family to the Child Assessment Center for a physical examination.  (*Id.* at 83).

Corporal Banda spoke with Medrano's wife and mother-in-law.  (*Id.* at 84).  The mother-in-law denied that she had come with anyone who met the description of the

assailant, but Medrano's wife said that her husband fit the description of the suspect.  (*Id.* at 86-87).  The description Medrano's wife provided matched the description provided by the complainant.  (*Id.* at 88).  Corporal Banda obtained a photograph of Medrano and showed it to Deputy Gipson, who identified the person in the photograph as the suspect.  Fearing that Medrano was a flight risk, Corporal Banda obtained an emergency arrest warrant.  Corporal Banda arrested Medrano in his home at 6510 Avenue K at about 1:30 a.m. on April 7, 2003. This home was approximately five miles from the Incarnate Word Academy.  (*Id.* at 92). When Corporal Banda first met Medrano, he spontaneously said, "I know why you're here I've already been and talked to the police."  Corporal Banda testified that none of his deputies had spoken to Medrano.

On cross-examination of Corporal Banda, defense counsel asked how he identified the stall in which the offense took place; whether he witnessed the offense first-hand; the time he arrived at the Academy; and whether his testimony related to events that took place after the offense.

Rosalinda Romo testified that her seventeen year-old daughter attended the Incarnate Word Academy and that Romo was active in the school.  (Reporter's Record, Vol. IV, p. 103).  She testified that on April 6, 2003, she served as the event coordinator for the bazaar at the Academy.  (*Id.* at 110).  During a performance, a young boy reported that he had been molested in the men's room.  Romo described the motion the complainant used to describe how the assailant had stroked the complainant's penis.  The complainant told Romo that the assailant was wearing blue plaid shorts and a blue shirt.  The complainant pointed to

Medrano, who was standing near a kitchen door.  (*Id.* at 106).  Romo saw that the complainant was shaking and in shock and looked as if he had been crying.  (*Id.* at 107).  Romo told the police that the man the complainant identified had been with two women and that he had been at the Academy all day.  Romo described the man identified by the complainant as a Hispanic male with aviator glasses, a mustache, wearing shorts and tennis shoes, with dark brown hair.

The following day, Romo met with the police, made a written statement, and viewed a photo spread.  Romo identified the person in position three but noted that he did not have a mustache.  (*Id.* at 113).  That person was not Medrano.  Romo identified Medrano in court.

Romo testified that Medrano's wife and mother-in-law initially acted as if they did not know Medrano.  (*Id.* at 116).  Romo did not see Medrano return to the Academy to take his wife and mother-in-law home.  Several hours after the festival ended, Romo saw them walking by themselves in the dark.

On cross-examination, defense counsel asked Romo whether there were other men at the festival; whether there were other men with brown hair and mustaches; when the festival started; whether the complainant was involved in the festival activities; whether Romo witnessed the assault; and when she saw the photo spread.

Corporal Max Rodriguez testified that he helped to execute the arrest warrant.  On April 7, 2003, he spoke with Romo and obtained a written statement.  Rodriguez also prepared a photo spread of approximately six photographs of people of the same race, gender, with similar features.  (*Id.* at 156-57).  Rodriguez testified that Romo had viewed the photo spread and identified the person in position three as the man who attacked the complainant.  The following day, Romo called Rodriguez and advised him that the man in the photograph was clean shaven, but she had seen him with a mustache and goatee.  Corporal Rodriguez also videotaped the live line-up.

The complainant testified.  The child said that he understood the meaning of telling the truth.  (Reporter's Record, Vol. IV, pp. 127-28).  The complainant testified that he was eight years old and in the second grade.  He was at the bazaar to take part in a dance performance.  (*Id.* at 130).  The complainant testified that after he performed his dance, he went to the restroom and went into a stall to change clothes.  (*Id.* at 132).  He changed his clothes and left the stall.  A man then stopped him; locked him in the stall; pulled down his blue jeans; and touched his penis.  The complainant reported the assault to his aunt.  The complainant saw the assailant before he went into the kitchen.  (*Id.* at 138).

The complainant testified that he went to the police station to view a line-up.  (*Id.* at 140).  The complainant identified Medrano.  The complainant noticed that Medrano had

changed his facial hair.  The complainant was unable to identify Medrano in the courtroom. (*Id.* at 143).

Corporal Alaniz testified that he was with Precinct 6 of the Harris County Constable's Office.  (Reporter's Record, Vol. IV, pp. 180-81).  He served as a translator during an interview with the complainant's aunt and during the line-up.  (*Id.* at 183).  Corporal Alaniz explained to the complainant that he should take his time in looking at the line-up.  The complainant immediately recognized one person.  (*Id.* at 186).  The officers called each of the line-up participants forward so that the complainant could study them.  (*Id.*).  The complainant identified the person in position four, Medrano, as his assailant.  (*Id.* at 188). Corporal Alaniz stated that the complainant's mother was present during the line-up but she did not signal him or indicate whom the complainant should identify.  (*Id.* at 190-91).  On cross-examination, defense counsel asked whether the complainant was positioned closest to the person in position four.

Mireya Ordaz, the complainant's aunt, testified that she took her daughter and two nephews to the church festival on April 6, 2003.  (Reporter's Record, Vol. IV, pp. 144-45). Ordaz testified that she waited for the complainant outside the restroom.  The complainant ran out of the restroom, pale and trembling.  (*Id.* at 146).  In response to his aunt's question, the complainant looked around and pointed at Medrano.  Ordaz testified that the complainant

11

showed her what Medrano had done to him in the restroom.  Ordaz demonstrated in court the gesture the complainant made.  She formed a circle with her index finger and thumb touching and her hand moved up and down.  (*Id.* at 147).  The complainant saw the man he identified as the assailant near the kitchen.  The complainant became nervous and urged his aunt not to say anything because Medrano had threatened him.  Ordaz saw Medrano go into the kitchen, stick his head out, and not return after that.  (*Id.* at 148).

On cross-examination, defense counsel asked Ordaz if she witnessed the incident, and whether her information about Medrano was based on information she learned from the complainant.

Joseph Guerra, a deputy with Precinct 6 of the Harris County Constable's Office, testified that he was assigned to the Sex Offender Task Force.  Guerra interviewed the complainant's aunt and organized the live line-up.  (*Id.* at 174).  He saw the complainant make a positive identification of the person in position four as his attacker.  (*Id.* at 178). On cross-examination of Deputy Guerra, defense counsel asked if the complainant viewed any photographs prior to the live line-up, whether the complainant's aunt was present during the line-up, and whether he witnessed the assault.

The boy's mother testified through an interpreter. (Reporter's Record, Vol. IV, p. 161).  She testified that her sister, Mireya Ordaz, took the complainant and his brother to

perform at the Academy festival.  The complainant's mother testified that she went with the complainant to the clinic for a sexual abuse examination.  On the night after the incident occurred, the complainant was frightened and did not want his father to touch him.  (*Id.* at 164).  In the days following the assault, she noticed that the complainant did not want his father to touch him, did not want to go into the restroom by himself, and was afraid of men.  She testified that the complainant is in weekly counseling.   She testified that the complainant's performance in school declined and he had trouble sleeping.

The defense called Carmen Juarez to testify.  (Reporter's Record, Vol. V, p. 6).  She testified that she worked with Medrano's wife at a doctor's office.  She saw Medrano on April 4, 2003 and noticed that he no longer had a mustache and was clean-shaven.  (*Id.* at 9).  On cross-examination, she testified that Medrano's wife told her that Medrano had been arrested.  She had known Medrano's wife for three years but did not socialize with her or Medrano.  She knew that Medrano and his wife drove a white sports utility vehicle, a Ford Explorer.  (*Id.* at 13).

Ricardo Reynosa testified that he had known Medrano for three years and was good friends with Medrano's wife.  Reynosa would see Medrano and his wife three times a week.  Reynosa testified that his birthday was on April 6, 2003.  He had had lunch with Medrano

and his wife on April 5, 2003.  (*Id.* at 16).  He recalled making fun of the fact that Medrano

had cut himself shaving his mustache.

Miguel Jiminez testified that he came back from a softball game on April 6, 2003 at

approximately 3:15 or 3:30 in the afternoon.  Medrano came over unannounced soon after

that, at about 3:45 or 4:00.  Medrano was still there when Jiminez left at 4:55.  On cross-

examination, Jiminez testified that he was married to Medrano's older sister but was not

close to Medrano and did not see him often.  Medrano came over to Jiminez's home to

borrow a truck for moving furniture but did not end up borrowing the truck.  Medrano's wife

came over to Jiminez's house and was very upset.

The jury found Medrano guilty and he received a life sentence.

## III.  The Applicable Legal Standards

This court reviews the petitioner's petition for writ of habeas corpus under the federal

habeas statutes as amended by the Antiterrorism and Effective Death Penalty Act of 1996.

28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*,

127 F.3d 409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).  Subsections

2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions

of law, and mixed questions of fact and law that result in an "adjudication on the merits."

An adjudication on the merits "is a term of art that refers to whether a court's disposition of

the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).

The AEDPA provides as follows, in pertinent part:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1)  In a proceeding instituted by an application for a  writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's

conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000). A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case; or (2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495. In deciding whether a state court's application was unreasonable, this court considers whether the application was "objectively unreasonable." *Id.* at 1495; *Penry v. Johnson,* 215 F.3d 504, 508 (5th Cir. 2000). Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

Pure questions of fact are governed by § 2254(d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). In addition, a state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589

(5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)). The petitioner's claims for relief are examined below under the applicable legal standard.

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Medrano is a *pro se* petitioner. In this circuit, *pro se* habeas petitions are construed liberally and are not held to the same stringent and rigorous standards as pleadings filed by lawyers. *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*,

852 F.2d 832, 834 (5th Cir. 1988); *Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June

1981).  This court broadly interprets Medrano's state and federal habeas petitions.  *Bledsue*

*v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

**IV.     The Claim That Are Procedurally Barred**

Medrano's federal petition includes claims that the trial court violated his right to due

process by excluding an anonymous "confession letter"; the trial court violated his right to

due process by admitting some of the state's photographic evidence; and the appellate court

erred in affirming his conviction.

The respondent contends that these claims are procedurally barred because the state

habeas court expressly refused to consider them on collateral review.  In its findings, the state

court stated:

> 1.  Because the applicant failed to raise on direct appeal his
> instant claims of trial and appellate court error, the applicant is
> procedurally barred from raising these claims in the instant
> proceeding.  *Ex parte Gardner,* 959 S.W.2d 189, 199 (Tex.
> Crim. App. 1998).
>
> 2.  In the alternative and without waiving the foregoing, the
> applicant fails to allege sufficient facts which, if true, would
> show that the trial or appellate court erred in applicant's case. *Ex
> parte Maldonado,* 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).

*Ex parte Medrano,* Application No. 65,446-01 at 147.

When a state court holds a claim barred on independent and adequate state-law grounds and reaches the merits of the claim in the alternative, the claim is procedurally barred in the federal habeas court.  *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Hughes v. Dretke*, 412 F.3d 582, 592-93 (5th Cir. 2005) (alternate holding on merits by state court, after finding procedural bar based on petitioner's failure to raise contemporaneous objection in the state court, did not preclude procedural bar in federal court); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005) (procedural bar to constitutional claim based on the petitioner's failure to contemporaneously object  remained despite state court's alternative holding that the constitutional claim lacked merit).

The state habeas court found that Medrano's claims of trial and appellate court error were barred, based on his failure to raise the claims on direct appeal.  This is an independent and adequate state-law ground.  Though the state habeas court alternatively reached the merits of the claims, the bar remains.  This court finds that Medrano's claims of trial and appellate court error are procedurally barred.

In his federal habeas petition, Medrano complains that appellate counsel rendered ineffective assistance.  (Docket Entry No. 2, Petitioner's Memorandum, pp. 26-27).  This claim is unexhausted because Medrano did not raise it in his state application for a writ of habeas corpus or in a petition for discretionary review.  Medrano is procedurally barred from

bringing this claim in a successive habeas petition because of Texas's abuse of the writ doctrine. *Ex parte Carr,* 511 S.W.2d 523, 525-26 (Tex. Crim. App. 1974).  A procedural rule that acts as a bar must be "firmly established and regularly followed." *Ford v. Georgia,* 498 U.S. 411, 423 (1991) (quoting *James v. Kentucky,* 466 U.S. 341, 348 (1984)).  Texas strictly and regularly applied the abuse of the writ doctrine when Medrano filed his habeas petition. *Emery v. Johnson,* 139 F.3d 191, 195, 201 (5th Cir. 1997); *see also Fearance v. Scott,* 56 F.3d 633, 642 (5th Cir. 1995).  Because Medrano would be precluded from asserting his unexhausted claim in a successive habeas petition in Texas state court, this court need not dismiss this petition without prejudice to permit him to exhaust this claim. *Fuller v. Johnson,* 158 F.3d 903, 906 (5th Cir. 1998).

A petitioner's procedural default precludes federal habeas corpus review "if the last state court rendering a judgment in the case rests its judgment on the procedural default." *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Boyd v. Scott*, 45 F.3d 876, 880 (5th Cir. 1994), *cert. denied*, 514 U.S. 1111 (1995).  In a case of procedural default, federal habeas review may be obtained only if the petitioner "can show 'cause' for the default and 'prejudice attributable thereto' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'"  *Harris*, 489 U.S. at 262 (quoting *Murray v. Carrier,* 477 U.S. 478, 485 (1986) and *Engle v. Isaac,* 456 U.S. 107, 135 (1986)); *Jacobs v. Scott*, 31

F.3d 1319, 1328 (5th Cir. 1994), *cert. denied*, 513 U.S. 1067 (1995).  Medrano has not shown cause, under the law, for his failure to raise his claim based on ineffective assistance of appellate counsel in his state application for habeas corpus relief or in a petition for discretionary review.  *Coleman*, 501 U.S. at 753.  Nor has Medrano demonstrated actual prejudice or that a "fundamental miscarriage of justice" will result from this court's failure to consider his unexhausted claim.  *Harris*, 489 U.S. at 262.

The claims of state trial and appellate court error do not provide a basis for relief under § 2254.

## V.     The Claim Based on Insufficiency of the Evidence

Medrano challenges the legal and factual sufficiency of the evidence introduced at his trial.  Medrano states that although three key witnesses—Deputy Mitchell Gipson, Rosalinda Romo, and Gabriel Sanchez—testified, only Romo was able to identify Medrano as the assailant.  Medrano argues that Deputy Gipson was initially unable to identify Medrano in court and did so only after a recess.  Medrano argues that Romo misidentified him.  Medrano admits that he was at the bazaar on April 6, 2003, with his wife and his mother-in-law, and that they talked with Romo on several occasions that day.  Medrano argues that Romo became familiar with him through those interactions and incorrectly identified that Medrano was the perpetrator.  Medrano argues that the complainant was unable to identify Medrano

as his assailant, though asked on two occasions.          In reviewing legal sufficiency, Texas and federal courts view the evidence in the light most favorable to the verdict and ask whether a rational trier of fact could find the essential elements of the crime, beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Under Texas law, intermediate appellate courts have the authority to review fact questions in criminal cases. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). This "factual sufficiency" review of the evidence is broader than a "legal sufficiency" challenge under *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Id.*  Instead of viewing the evidence in the light most favorable to the prosecution and determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," a factual sufficiency inquiry views all the evidence to determine whether the verdict "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.*  State appellate courts review the factual sufficiency of the evidence based on Texas statutory and constitutional authority.  *Id.* at 129-30; *Bigby v. State*, 892 S.W.2d 864, 874-75 (Tex. Crim. App. 1994).  However, while Texas law permits factual sufficiency reviews by Texas state appellate courts, there is no corresponding federal authority for federal habeas court to conduct such a review.

On federal habeas corpus review, the evidentiary sufficiency of a state court conviction is governed by the standard in *Jackson v. Virginia*, 443 U.S. 307 (1979), which reflects the federal constitutional due process standard. *See Woods v. Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002). Under Fifth Circuit authority, a state may impose a more exacting standard for determining the sufficiency of the evidence, but a federal court reviews § 2254 challenges to the sufficiency of the evidence for a state conviction under the *Jackson* standard. *West v. Johnson*, 92 F.3d 1385, 1394 (5th Cir. 1996); *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990); *Jones v. Butler*, 864 F.2d 348, 361 (5th Cir. 1988). Medrano's claim that the state court erred in finding the evidence sufficient under state law cannot be the basis of federal habeas relief. Medrano's claim that the evidence was legally insufficient under the *Jackson* standard lacks merit. This standard requires that a reviewing court determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. In conducting that review, a federal habeas corpus court may not substitute its view of the evidence for that of the factfinder, but must consider all of the evidence in the light most favorable to the verdict. *See Weeks v. Scott*, 55 F.3d 1059, 1061 (5th Cir. 1995). The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, as long as a reasonable trier

of fact could find that the evidence established guilt beyond a reasonable doubt.  *United States v. Stevenson,* 126 F.3d 662, 664 (5th Cir. 1997).

To determine whether the evidence is sufficient to support a state criminal conviction, a federal habeas court looks to state law for the substantive elements of the relevant criminal offense.  *Jackson,* 443 U.S. at 324 n.16; *Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000), *cert. denied,* 121 S. Ct. 885 (2001).  Either direct or circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction.  *Schrader v. Whitley,* 904 F.2d 282, 287 (5th Cir.), *cert. denied,* 498 U.S. 903 (1990).  A federal court may not substitute its own judgment about the credibility of witnesses for that of the state courts.  *Marler v. Blackburn,* 777 F.2d 1007, 1012 (5th Cir. 1985).  Credibility choices must be resolved in favor of the jury's verdict.  *United States v. Nguyen,* 28 F.3d 477, 480 (5th Cir. 1994).  Credibility issues are for the finder of fact and do not undermine the sufficiency of the evidence.  *United States v. Morgan,* 117 F.3d 849, 854 n.2 (5th Cir.), *cert. denied,* 118 S. Ct. 641 (1997).  "Where a state appellate court has conducted a thoughtful review of the evidence, moreover, its determination is entitled to great deference."  *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993) (citation omitted).

In the present case, the Texas courts rejected Medrano's claims of factual and legal insufficiency on grounds that are entitled to deference from this federal habeas court.  To

prove that Medrano committed the offense of indecency with a child, as charged in the indictment, the state was required to show that on April 6, 2003, Medrano unlawfully, intentionally, and knowingly engaged in sexual contact with a child under the age of seventeen years and not Medrano's spouse, by touching the child's genitals with the intent to arouse and gratify Medrano's sexual desire. *Ex parte Medrano,* Application No. 65,446-01 at 163.  A person commits indecency with a child if, with a child younger than 17 years and not the person's spouse, whether the child is of the same or opposite sex, the person engages in sexual contact with the child or causes the child to engage in sexual contact. *See* Tex. Pen. Code Ann. § 21.11(a)(1) (Vernon Supp. 2003).

The appellate court found:

> In his first issue, appellant contends that, because of [the complainant's] inability to identify him at trial, the evidence was legally insufficient to support his conviction.  Appellant further argues that, because he had an alibi, the evidence was factually insufficient to support his conviction.

> **A.  In-Court Identification**

> When conducting a legal-sufficiency review, we view the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt.  *King v. State,* 29 S.W.3d 556, 562 (Tex. Crim. App. 2000); *Howley v. State,* 943 S.W.2d 152, 155 (Tex. App. - Houston [1st Dist.] 1997, no pet.).  Although a legal-sufficiency analysis entails a consideration of all evidence presented at trial, we may neither re-weigh the evidence nor substitute our judgment for the jury's.

*King,* 29 S.W.3d at 562.  The jury, as trier of fact, is the sole judge of the credibility of witnesses and may believe or disbelieve all or any part of a witness's testimony.  *Reece v. State,* 878 S.W.2d 320, 325 (Tex. App. - Houston [1st Dist.] 1994, no pet.).

In this case, appellant was charged with indecency with a child.  Appellant argues that the identification evidence is insufficient because [the complainant] did not identify appellant in court as the perpetrator.  We disagree.

Identity may be proven by direct evidence, circumstantial evidence, or even inferences.  *See Earls v. State,* 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (noting that victim's mis-identification of juror as perpetrator at trial was not fatal where circumstantial evidence, including testimony of officer who arrested defendant at scene, pointed to the defendant as the perpetrator).  Proof of the accused's identity through circumstantial evidence is not subject to a more rigorous standard than is proof by direct evidence, as both are equally probative.  *McGee v. State,* 774 S.W.2d 229, 238 (Tex. Crim. App. 1989).  The sufficiency of the evidence is then determined from the cumulative effect of all the evidence.  *See Alexander v. State,* 740 S.W.2d 749, 758 (Tex. Crim. App. 1987).  The absence of an in-court identification is merely a factor for the jury to consider in assessing the weight and credibility of the witnesses' testimony.  *See Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (even a total failure to identify the defendant on one occasion goes only to the weight to be given to the identification evidence).

In the present case, the State asked [the complainant], "Do you see the man in the courtroom here today, . . . [who] touched you on your penis in the bathroom?"  [The complainant] replied, "No."  [The complainant], however, positively identified appellant in a lineup a few days after the alleged offense.  [The complainant's] identification was videotaped and the videotaped

identification was admitted into evidence and published for the jury. Accordingly, the fact that [the complainant] did not identify appellant in court, goes to the weight of the evidence and not its admissibility. *See Id.*

Additionally, after appellant was brought to the police station, Gipson identified him as the same man [the complainant] pointed out at the festival. After identifying appellant, Gipson explained that appellant had shaved his facial hair and changed clothes, but was still wearing the same glasses he had worn at the festival. At trial, Gipson also identified appellant as the same person whom [the complainant] had identified and who had run out of the auditorium. Gipson noted that appellant looked different at trial because he had combed his hair differently and was not wearing glasses. Furthermore, Romo was asked to identify the man [the complainant] had pointed out at the festival, and she identified appellant both at trial and after looking [sic] a photo spread. During her direct testimony, Romo also explained that appellant no longer had a moustache as he did in the photograph.

Viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt that appellant committed the offense of indecency with [the complainant]. Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction.

*Medrano v. State*, No. 01-03-01270-CR, 2005 WL 1189659 **1-3 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd) (not designated for publication).

In examining the evidence as to Medrano's guilt, the appellate court concluded that the evidence was legally sufficient to support the verdict. A federal habeas court must give deference to the state courts' determination of the sufficiency of the evidence. *Callins v.*

*Collins,* 998 F.2d 269, 276 (5th Cir. 1993), *cert. denied,* 510 U.S. 1141 (1994); *Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir.), *cert. denied,* 474 U.S. 855 (1985).  A review of the record discloses sufficient basis for applying this deferential standard.

Medrano argues that the evidence was insufficient to support the verdict because the only three witnesses to the events were not able to identify him. The transcript of the trial shows that the complainant did identify Medrano in the line-up, Romo identified him in court, and Deputy Gipson initially failed to, then did, identify him in court.  There was evidence explaining the circumstances of the identifications.   The evidence included testimony that while the man believed to be the assailant was seen with facial hair, and Medrano was clean-shaven when arrested the next day, Medrano showed evidence of a recent shave.  The witnesses at trial provided identification testimony and the jury believed that testimony.  The jury is the sole judge of the facts, the credibility of the witnesses, and the weight to be given the evidence.  *Beckham v. State*, 29 S.W.3d 148, 152 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000) (en banc).  Reconciliation of  conflicts in the evidence is within the exclusive province of the jury.  *Id.*

A Texas court reviewing the sufficiency of the evidence does not engage in a second evaluation of the weight and credibility of the evidence, but only ensures that the jury

reached a rational decision.  *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993) (en banc).  If there is evidence that establishes guilt beyond a reasonable doubt, and the trier of fact believes that evidence, the state appellate court does not sit as a thirteenth juror in reassessing the evidence.  *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988) (en banc).  This court's review for sufficiency of the evidence is not based on the credibility of witnesses or the weight of the evidence.  *United States v. Garcia,* 995 F.2d 556, 561 (5th Cir. 1993).

The record evidence supports the conclusion that the State proved the elements of the felony offense indecency with a child, beyond a reasonable doubt.  The evidence at trial showed that Medrano touched the complainant's penis on April 6, 2003.  The evidence, viewed in the light most favorable to the verdict, provided an ample basis for a rational trier of fact to find the elements of the crime, beyond a reasonable doubt.  The state court's decision as to the sufficiency of the evidence reasonably applied the law to the facts, consistent with clearly established federal law.  Medrano has not shown a basis for the relief he seeks.  28 U.S.C. § 2254(d)(1).

## VI.    The Claim of Ineffective Assistance of Trial Counsel

To succeed on a claim of ineffective assistance of counsel, a habeas corpus petitioner must first show that "counsel's representation fell below an objective standard of

reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The standard requires the reviewing court to give deference to counsel's performance, strongly presuming that counsel exercised reasonable professional judgment. *Id.* at 690. Counsel's performance is deficient only when his "representation [falls] below an objective standard of reasonableness." *Id.* The court measures reasonableness against prevailing professional norms, viewed under the totality of the circumstances. *Id.* at 688. "Judicial scrutiny of counsel's performance is highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The Sixth Amendment does not guarantee an accused "errorless representation." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997) (citing *Moreno v. Estelle*, 717 F.2d 171, 176 (5th Cir. 1983)).

The habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. He must "affirmatively prove," not just allege, prejudice. *Id.* at 693. If he fails to prove the prejudice component, the court need not address the question

of counsel's performance.  *Id.* at 697.  Strategic decisions by counsel generally do not provide a basis for habeas corpus relief.  *See Strickland*, 460 U.S. at 689.

Medrano alleges that trial counsel rendered ineffective assistance at trial in three respects.  The state habeas court found:

> 6.  The applicant fails to allege sufficient facts which, if true, would show that trial counsel's conduct fell below an objective standard of reasonableness and that, but for counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different.  *Strickland v. Washington,* 466 U.S. 668, 686 (1984); *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting the *Strickland* standard in Texas); and *Narvaiz* v. *State,* 840 S.W.2d 415, 434 (Tex. Crim. App. 1992) (defining the two-part *Strickland* standard).

> 7.  The applicant fails to show that his trial counsel's pre-trial investigation and preparation fell below an objective standard of reasonableness or that the outcome of the case would have been different but for the alleged deficient investigation.

> 8.  The totality of the representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Ex parte Medrano,* Application No. 65,446-01 at 148.  Each of the areas Medrano alleges as ineffective assistance is examined below.

### A.     The Claim of Counsel's Failure to Investigate

Medrano complains that defense counsel was unfamiliar with relevant case law. Medrano explains that before his trial began, an Administrator at Queen of Peace Catholic Church advised the prosecutor that the "true perpetrator" of the offense for which Medrano was charged had written a confession letter to a church administrator. Medrano claims that the prosecutor secretly obtained a writing sample from him to compare to the handwriting on the confession letter. Medrano complains that the trial court erred in excluding this crucial evidence. Medrano alleges that his counsel should have conducted legal research and should have been prepared to explain why the confession letter was admissible.

Medrano submitted a copy of the "True Perpetrator's Confession Letter." (Docket Entry No. 2, Petitioner's Memorandum, Appendix A, pp. 1-2). In this undated letter, an unidentified person confesses to molesting three young boys at Astro World; one boy at the Blessed Sacrament Church; two boys at Incarnate Word Church; one boy at the Queen of Peace Festival; one boy at Our Lady of Guadalupe festival; and one boy at the Tejano festival. The person stated that his last victim scratched his face and broke his glasses. The unidentified person stated that he had a serious problem and sought prayers for his recovery.

Medrano only claims that defense counsel should have conducted an investigation of relevant case law. Medrano does not allege what a proper investigation into the case law would have revealed or how it would have benefitted him. *United States v. Glinsey*, 209 F.3d

386, 393 (5th Cir. 2000) (citing *United States v. Green,* 882 F.2d 999, 1003 (5th Cir. 1989)). Medrano must also show a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different.  Medrano does not explain how an additional investigation of relevant case law would have changed the outcome of the trial.

Medrano states that the trial court refused to admit the "true perpetrator's" letter.  This court was unable to locate this ruling in the record.  If the letter was deemed inadmissible on authentication or hearsay grounds, it is unclear how counsel's alleged failure to investigate the case law led to that result.  Even if counsel had been successful in locating case authority and persuading the trial court to admit the "true perpetrator's" letter, there is no basis to conclude the result of the trial would have been different.  The letter is undated and unsigned. The jury could reasonably question its veracity and could reasonably ask whether Medrano or someone acting on his behalf wrote the letter.

Medrano has not shown that counsel's performance was deficient or that he was prejudiced as a result.  Medrano is not entitled to relief on this claim.

**B.      The Claim of Counsel's Failure to Call Witnesses**

Medrano argues that had defense counsel deposed Gipson, Romo, and the complainant, he would have learned of potential witnesses who could have testified that

Medrano had already left the bazaar at the time of the offense.  Medrano argues that his counsel should have called witnesses in support of his alibi and misidentification defenses. Medrano complains that counsel failed to call his wife, Bertha Medrano, and mother-in-law, Anita Del Angel, to testify as alibi witnesses.  *Ex parte Medrano,* Application No. 65,446-01 at 41.

Medrano states that he and his wife were together the day before the bazaar and that his wife and mother-in-law accompanied him to the bazaar and were with him throughout the day.  Medrano asserts that his wife could have testified that he left during the festival to complete their move into his mother-in-law's home.  Medrano argues that his wife could have testified as to his location just before, during, and after the offense; his facial features; how he combed his hair that day; and the clothing he wore that day.  Medrano states that defense counsel was aware of the wife's information but decided that she would make an unreliable witness because she was too emotionally unstable to testify.  (*Id.* at 42).

Decisions on the presentation of evidence and witnesses are essentially strategic. Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy.  *Wilkerson v. Cain,* 233 F.3d 886, 892-93 (5th Cir. 2000) (citing *United States v. Cockrell,* 720 F.2d 1423, 1427 (5th Cir. 1983)).  There is no basis to conclude that the decision not to call Medrano's wife as an alibi witness was

deficient.  There is no basis other than speculation to support Medrano's argument that the outcome of the trial would have been different had counsel presented testimony from Medrano's wife about his whereabouts on April 6, 2003.

Defense counsel presented Miguel Jiminez, Medrano's brother-in-law, as an alibi witness.  Jiminez testified that Medrano had come to his home between 3:45 and 4:00 p.m. on April 6, 2003 and remained there at least until 4:55 p.m.  Defense counsel also presented two other witnesses who testified that Medrano had recently shaved off his mustache. Medrano does not explain how additional testimony from his wife or mother-in-law would have altered the outcome of trial.

The jury heard testimony from officers who interviewed Medrano's wife and mother-in-law.  The officers testified that Medrano's wife did not know what he was wearing that day; that the description she gave matched the description the complainant gave of the suspect; and that Medrano had left by himself during the festival.  The officers testified that the mother-in-law denied being with anyone who met the description of Medrano.  Witnesses testified that they saw Medrano's wife and mother-in-law walking home in the dark, well after the festival was over.  Defense counsel may have made a reasoned tactical decision not to call Medrano's wife or mother-in-law as witnesses to avoid cross-examination on these areas.

35

The prosecutor did comment on the defense's failure to call Medrano's wife and mother-in-law.  She argued that they would have been called if they had had favorable testimony to give.  (Reporter's Record, Vol. V, p. 49).  But had counsel called Medrano's wife and mother-in-law to testify, the prosecutor would likely have made the same argument that she made about Miguel Jiminez: any favorable testimony was not credible because he was only trying to help the family.  (Reporter's Record, Vol. V, pp. 44-45).

Even if counsel had offered the additional testimony of Medrano's wife and mother-in-law, Medrano has not explained why the jury would have reached a different result.  Neither Medrano's wife nor mother-in-law were near the restroom where the offense took place.  Counsel's strategy at trial was to discredit the State's witnesses by arguing that they did not witness the assault and could not make a reliable identification of the assailant.  The additional evidence that Medrano alleges his counsel was deficient for not presenting does not provide such strong support for his claim that he had already left the bazaar at the time of the offense as to make it likely that the jury would have reached a different result.

The state habeas court concluded that Medrano had received reasonably effective assistance of counsel.  The state court's decision as to the effective assistance of counsel reasonably applied the law to the facts, consistent with clearly established federal law.  Medrano has not shown a basis for the relief he seeks.  28 U.S.C. § 2254(d)(1).

**C.      The Claim of Counsel's Failure to Introduce Photographs**

Medrano claims that his wife provided certain photographs to defense counsel that would have provided supported for his misidentification defense.  (Docket Entry No. 2, Petitioner's Memorandum, p. 14).  Medrano complains that counsel failed to introduce these photographs at trial.  Medrano does not explain when these photographs were taken, what they showed, or how they would have assisted the defense.  As noted, decisions on the presentation of evidence are essentially strategic.  Medrano has not shown that counsel's performance was deficient or that he was prejudiced by the failure to introduce the photographs.

Medrano is not entitled to habeas corpus relief on this claim.

**VII.   The Claim Based on the Failure to Correct False Testimony**

Medrano argues that Deputy Gipson, the State's key witness, gave false testimony in the following respects:

(1)      Deputy Gipson tried to cover up his own fault in failing to recognize and react appropriately to a crime in progress.  Medrano argues that Deputy Gipson was in the restroom but failed to recognize that a crime was taking place.  Because he failed to recognize and react to these indications of a

crime in progress, Deputy Gipson was upset with himself and lied to cover up his inadequacies.

(2)     Deputy Gipson tried to excuse his failure to capture the perpetrator. Medrano states that though Deputy Gipson gave chase, he allowed the suspect to escape from the Academy.  Medrano asserts that Deputy Gipson failed to apprehend the true perpetrator.   Medrano asserts that Deputy Gipson made inconsistent statements about the path he took in chasing the perpetrator.  Specifically, Medrano argues that Deputy Gipson first said he chased the suspect through the kitchen.  Later, Deputy Gipson said that he pursued the suspect through the front entrance.  Medrano states that Deputy Gipson also made inconsistent statements about whether a gate located behind the kitchen entrance was open or closed.

(3)     Medrano claims that Deputy Gipson made false statements about his conversations with the complainant.  Medrano asserts that Deputy Gipson claimed to have obtained a description of the suspect from the complainant, but that the complainant denied speaking to Deputy Gipson. Medrano argues that Deputy Gipson lied when he said that the complainant told him of the assailant's threats.  Medrano asserts that the complainant never testified that

he was threatened.  Medrano argues that Deputy Gipson never spoke to the complainant and did not rely on a description from the complainant.  He claims that Deputy Gipson saw the perpetrator and started chasing him. Medrano argues that the complainant's identification at the lineup was the product of his mother's suggestions.

Medrano has failed to present a basis to support his allegation that the State knowingly presented false, material testimony. *See United States v. Leahy,* 82 F.3d 624, 632 (5th Cir. 1996); *United States v. Washington,* 44 F.3d 1271, 1282 (5th Cir. 1995). Although it offends constitutional due process for a prosecutor knowingly to use or intentionally fail to correct testimony that he knows to be false, the record does not show that Deputy Gipson's testimony was false or that the prosecutors knew his  testimony to be false.  *See Napue v. Illinois*, 360 U.S. 264, 271 (1959).  Discrepancies in a witness's testimony establish a credibility question for the jury, but that is not enough to establish that the testimony was false.  *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990); *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988).

The state habeas court found that "[t]he applicant fails to allege sufficient facts which, if true, would show that the prosecutor used perjured testimony in applicant's trial." *Ex parte Medrano,* Application No. 65,446-01 at 148, Finding #5.  The Court of

Criminal Appeals expressly based its denial of habeas relief on this finding.   These determinations are entitled to a presumption of correctness.   28 U.S.C. § 2254(e)(1).   Medrano has not produced clear and convincing evidence to rebut this finding.   The state court's decision as to the prosecutorial misconduct reasonably applied the law to the facts, consistent with clearly established federal law.   Medrano has not shown a basis for the relief he seeks.   28 U.S.C. § 2254(d)(1).   Medrano is not entitled to habeas corpus relief on this claim.

## VIII.  Conclusion

The respondent's motion for summary judgment, (Docket Entry No. 8), is granted.   Medrano's petition for a writ of habeas corpus is denied.   This case is dismissed.   Medrano's motion to file a 22-page response, (Docket Entry No. 11), is granted.   Any remaining pending motions are denied as moot.

Under the AEDPA, a petitioner must obtain a certificate of appealability before he can appeal the district court's decision.   28 U.S.C. § 2253(c)(1).   This court will grant a COA only if the petitioner makes "a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   In order to make a substantial showing, a petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   When the district court has denied a claim on procedural grounds, however, the petitioner must also demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling."   *Id.*   As the Supreme Court made clear in its

decision in *Miller-El v. Cockrell*, 537 U.S. 322 (2003), a COA is "a jurisdictional prerequisite," and "until a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."  When considering a request for a COA, "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate."  *Id.* at 1042.

Because Medrano has not made the necessary showing, this court will not issue a COA.

SIGNED on September 26, 2008, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge